**BURCH & CRACCHIOLO, P.A.**
702 EAST OSBORN ROAD
PHOENIX, ARIZONA 85014
TELEPHONE (602) 274-7611
Edwin D. Fleming, SBA #0009685
efleming@bcattorneys.com
Jake D. Curtis, SBA #019726
jcurtis@bcattorneys.com

Attorneys (local) for Plaintiff

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY
MICHAEL M. GOLDBERG
EX KANO S. SAMS II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160
Email:  lglancy@glancylaw.com
Email:  mmgoldberg@glancylaw.com
Email:  esams@glancylaw.com

*Attorneys for Plaintiff*
*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| KATHLEEN MORRIS, Derivatively On Behalf of Nominal Defendant FIRST SOLAR, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL J. AHEARN, ROBERT J. GILLETTE, CRAIG KENNEDY, WILLIAM J. POST,  J. THOMAS PRESBY , MICHAEL SWEENEY, JOSÉ H. VILLARREAL, JAMES F. NOLAN and PAUL H. STEBBINS, <br><br> Defendants. <br><br> -and- <br><br> FIRST SOLAR, INC. <br><br> Nominal Defendant. | No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1.     Plaintiff, for her verified shareholder derivative complaint, by her undersigned attorneys, alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters.

2.     This is a shareholder derivative action brought on behalf of First Solar, Inc., ("First Solar" of the "Company") against the Company's board of directors seeking to remedy their intentional or reckless breaches of their fiduciary duties that caused substantial losses to the Company beginning on or before April 30, 2008 through February 28, 2012 (the "Relevant Period").  Plaintiff's allegations are made upon information and belief based on the investigation of her counsel, which included, among other things, the complaint in the pending federal securities fraud class action captioned *Smilovits v. First Solar, Inc., et al.*, No. 2:12-cv-00555-DGC (D. Ariz.), the Company's public filings with the United States Securities and Exchange Commission ("SEC"), analyst reports, press releases, and other publicly available documents and information.

3.     Formed in 1999, First Solar is a leading manufacturer of photovoltaic (PV) modules, which produce electricity with a thin cadmium telluride (CdTe) film on glass. The lower cost of First Solar's modules that are based on CdTe instead of silicon has been the key driver of its market performance. While offering both extended power output and materials and workmanship warranties on its products, First Solar tries to gain an edge in the increasingly competitive PV module market by consistently driving down its manufacturing costs.  As of 2010, First Solar was considered the second-largest maker of PV modules worldwide.  Its common stock has been trading on the NASDAQ Global Market ("NASDAQ") since 2006 and the public relied on the

Company's public statements and regulatory filings to gauge the soundness of their investments in the Company.

4.     From April 30, 2008 until February 28, 2012, while the Company faced mounting warranties claims due to a manufacturing problem[1], Defendants tried to maintain a façade of normalcy in the Company's operational and financial results through press releases and SEC filings that led the public to believe that the Company's operational and financial performance were sound.

5.     On October 31, 2008, for example, the Company filed a quarterly report for the period ended September 27, 2008 on Form 10-Q with the SEC. For the quarter, the Company reported net income of $99 million, or $1.20 diluted EPS and revenue of $349 million, as compared to net income of $46 million, or $0.58 diluted EPS and revenue of $159 million, for the same period a year ago. Nowhere in the 10-Q did the Company report any problem in the Company's operational or financial conditions.

6.     Unbeknownst to the investing public, First Solar experienced a serious manufacturing deviation from June 2008 to June 2009 that exposed a certain number of the solar modules that it produced to potential premature power losses once installed in the field. The Company subsequently engaged itself in the costly process of handling warranty claims and offering remediation programs beyond the warranties. Yet the scale of the manufacturing problem and the costliness of the remediation programs were concealed from investors.

---

[1]     Obscuring the actual nature and extent of the problem, the Company's public statements during the Relevant Period consistently referred to this problem – a manufacturing deviation resulting in the production of defective solar panels – as a manufacturing "excursion."

7.    The truth began to emerge on February 28, 2012. After the market closed on that day, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011. For the fourth quarter, the Company reported a net loss of $413 million, or ($4.74) diluted EPS and revenue of $660 million, as compared to net income of $156 million, or $1.80 diluted EPS and revenue of $609.8 million, for the same period a year ago. The Company also disclosed that the fourth quarter of 2011 was impacted by pre-tax charges of $393 million (reducing EPS by $3.90) associated with a "non-cash goodwill impairment" for their components business, and $164 million (reducing EPS by $1.67) related to warranty and cost in excess of normal warranty expense, and $60 million (reducing EPS by $0.43) related to restructuring activities. On this news, First Solar securities plummeted $4.10 per share, to close at $32.30 per share on February 29, 2012 and 11% of investors' collective wealth in the Company was lost in the course of one single day.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.    This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so

as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District; and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

### PARTIES

12.     Plaintiff is, and was at all times during the Relevant Period, a First Solar shareholder.  Plaintiff brings this action derivatively in the right of, and for the benefit of First Solar.  Plaintiff will fairly and adequately represent the interests of First Solar and its shareholders in enforcing the rights of the Company.  Plaintiff is a citizen of the State of Michigan.

13.     Nominal defendant First Solar is a Delaware corporation with its principal executive offices situated at 350 West Washington Street Suite 600, Tempe, Arizona.   The Company manufactures solar modules and provides solar power solutions. The Company's stock trades on the NASDAQ under the symbol "FSLR."

14.     Defendant Michael J. Ahearn ("Ahearn") serves as chairman of the board of directors of First Solar and served as chief executive officer from August 2000 to September 2009 and executive chairman from October 2009 to December 2010.  Upon information and belief, Ahearn is a resident of Arizona.

- 5 -

15.     Defendant Robert J. Gillette ("Gillette") has served as President, Chief Executive Officer and Director since March 2008.   Upon information and belief, Gillette is a resident of Arizona.

16.     Defendant Craig Kennedy ("Kennedy") has served as a Director of the Company since September 2007. Upon information and belief, Kennedy is a resident of the District of Columbia.

17.     Defendant William J. Post ("Post") has served as a Director of the Company since 2010.  Upon information and belief, Post is a resident of Arizona.

18.     Defendant J. Thomas Presby ("Presby") has served as a Director of the Company since August 2006.  Upon information and belief, Presby is a resident of Connecticut.

19.     Defendant Michael Sweeney ("Sweeney") has served as a Director since July 2003. Upon information and belief, Sweeney is a resident of Minnesota.

19.     Defendant José H. Villarreal ("Villarreal") has served as a Director since September 2007.  Upon information and belief, Villarreal is a resident of Texas.

20.     Defendant Paul H. Stebbins ("Stebbins") has served as a Director since 2006.  Upon information and belief, Stebbins is a resident of Florida.

21.     Defendant James F. Nolan ("Nolan") has served as a Director since 2003.  Upon information and belief, Nolan is a resident of Arizona.

24.     Defendants Ahearn, Gillette, Kennedy, Post, Presby, Sweeney, Villarreal, Nolan, and Stebbins are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     The Individual Defendants, because of their positions of control and authority as directors or officers of First Solar, were able to and did, directly and indirectly, control or fail to control the wrongful acts complained of herein.  Because of their directorial and executive positions with First Solar, each of the Individual Defendants had access to adverse non-public information about the operations and financial prospects of First Solar, including, without limitation, the misconduct of the other Individual Defendants.

26.     At all material times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of First Solar, and was at all times acting within the course and scope of said agency.

27.     To discharge their duties, the officers and directors of First Solar were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial, business, and corporate affairs of the Company. By virtue of such duties, the officers and directors of First Solar were required, among other things, to:

a.      Manage, conduct, supervise and direct the business affairs of First Solar in accordance with the laws of the United States, the states in which it conducted business, and First Solar's charter and bylaws;

b.      Implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor and prevent the officers, directors and employees of First Solar from violating or acting in contravention of all applicable federal and state laws, rules and regulations; and

c.  Refrain from using their status as directors or officers to the detriment of the Company and its shareholders.

28.  Certain Individual Defendants assumed additional fiduciary duties in connection with their service on the Board's Audit Committee, duties which they were required to exercise with loyalty and in good faith.

29.  According to its charter, the Audit Committee's purpose includes oversight of the Company's accounting and financial reporting process, financial statements and related disclosure.  The Audit Committee members are required to (1) "review and discuss with management and the independent auditor the Form 10-Q report prior to its filing", including "the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations'"; (2) "review and discuss with management and the independent auditors the Company's Annual Report on Form 10-K prior to its filing, including the financial statements contained therein and the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations"; (3) Review the Company's system of internal controls and discuss with management any material issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies"; (4) Review and discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures," among other things.

30.  As alleged herein, the members of the Audit Committee each violated their duties as a member of that committee in that they utterly failed to implement and oversee in good faith, and with loyalty, adequate internal controls sufficient to monitor

and prevent the officers, directors and employees of First Solar from violating or acting in contravention of applicable laws, and/or intentionally and/or recklessly failed to detect and/or encouraged and/or aided and abetted misconduct by the Individual Defendants and the officers and employees of First Solar. They also drafted, produced, reviewed, and/or disseminated the material false and misleading statements and information alleged herein and/or were aware, or should have been aware, or recklessly disregarded, that materially false and misleading statements were being issued regarding the Company during the Relevant Period.

31.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and board of directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.

32.    As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ during the Relevant Period, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty promptly to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business,

products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and each is therefore primarily liable for the representations contained therein.

33.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, press releases, and other communications complained of herein and were aware of, or deliberately or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of, or deliberately or recklessly disregarded, their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with First Solar, each of the Individual Defendants had access to the adverse undisclosed information about First Solar's operations and business and financial prospects as particularized herein, and knew or should have known or recklessly disregarded, that these adverse facts rendered the positive representations made by or about First Solar and its business issued or adopted by the Company materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

**Background**

34.     On April 30, 2008, the Company issued a press release announcing its financial results for the first quarter ended March 29, 2008. For the quarter, the Company reported net income of $47 million, or $0.57 diluted earnings per share ("EPS") and revenue of $197 million, as compared to net income of $5 million, or

$0.07 diluted EPS and revenue of $67 million, for the same period a year ago.

35.     On May 2, 2008, the Company filed a quarterly report for the period ended March 29, 2008 on Form 10-Q with the SEC, and reiterated the Company's quarterly financial results and financial position. In addition, the Form 10-Q contained a signed   certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that it disclosed any material changes to the Company's internal control over financial reporting.

36.     On July 30, 2008, the Company issued a press release announcing its financial results for the second quarter ended June 28, 2008. For the quarter, the Company reported net income of $70 million, or $0.85 diluted EPS and revenue of $267 million, as compared to net income of $44 million, or $0.58 diluted EPS and revenue of $77 million, for the same period a year ago.

37.     On July 31, 2008, the Company filed a quarterly report for the period ended June 28, 2008 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

38.     On October 16, 2008, the Company issued a press release announcing its financial results for the third quarter ended September 27, 2008. For the quarter, the Company reported net income of $99 million, or $1.20 diluted EPS and revenue of

$349 million, as compared to net income of $46 million, or $0.58 diluted EPS and revenue of $159 million, for the same period a year ago.

39.     On October 31, 2008, the Company filed a quarterly report for the period ended September 27, 2008 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On February 24, 2009, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 27, 2008. For the year, the Company reported net income of $348 million or $4.24 diluted EPS and revenue of $1.2 billion, as compared to net income of $158 million or $2.03 diluted EPS and revenue of $504 million, for the same period a year ago. For the fourth quarter, the Company reported net income of $133 million or $1.61 diluted EPS and revenue of $434 million, as compared to net income of $63 million or $0.77 diluted EPS and revenue of $201 million, for the same period a year ago.

41.     On February 25, 2009, the Company filed an annual report for the period ended December 27, 2008 on Form 10-K with the SEC, which was signed by, among others, Defendant Ahearn, and reiterated the Company's previously announced financial results and financial position. In addition, the Form 10-K contained a signed certification pursuant to SOX by Defendant Ahearn, stating that the financial information contained in the Form 10-K was accurate and disclosed any material

changes to the Company's internal control over financial reporting.

42.    On April 29, 2009, the Company issued a press release announcing its financial results for the first quarter ended March 28, 2009. For the quarter, the Company reported net income of $165 million, or $1.99 diluted EPS and revenue of $418 million, as compared to net income of $47 million, or $0.57 diluted EPS and revenue of $197 million, for the same period a year ago.

43.    On May 1, 2009, the Company filed a quarterly report for the period ended March 31, 2009 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

44.    On July 30, 2009, the Company issued a press release announcing its financial results for the second quarter ended June 27, 2009. For the quarter, the Company reported net income of $181 million, or $2.11 diluted EPS and revenue of $526 million, as compared to net income of $70 million, or $0.85 diluted EPS and revenue of $267 million, for the same period a year ago.

45.    On August 3, 2009, the Company filed a quarterly report for the period ended June 27, 2009 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and that

they disclosed any material changes to the Company's internal control over financial reporting.

46.    On October 28, 2009, the Company issued a press release announcing its financial results for the third quarter ended September 26, 2009. For the quarter, the Company reported net income of $153 million, or $1.79 diluted EPS and revenue of $481 million, as compared to net income of $99 million, or $1.20 diluted EPS and revenue of $39 million, for the same period a year ago.

47.    On October 30, 2009, the Company filed a quarterly report for the period ended September 26, 2009 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.

48.    On February 18, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 26, 2009. For the year, the Company reported net income of $640 million, or $7.53 diluted EPS and revenue of $2.1 billion, as compared to net income of $348 million or $4.24 diluted EPS and revenue of $1.2 billion, for the same period a year ago. For the fourth quarter, the Company reported net income of $142 million, or $1.65 diluted EPS and revenue of $641 million, as compared to net income of $133 million or $1.61 diluted EPS and revenue of $434 million, for the same period a year ago.

49.    On February 22, 2010, the Company filed an annual report for the period

ended December 26, 2009 on Form 10-K with the SEC, which was signed by, among others, Defendants Ahearn and Gillette, and reiterated the Company's previously announced financial results and financial position. In addition, the Form 10-K contained a signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

50. On April 28, 2010, the Company issued a press release announcing its financial results for the first quarter ended March 27, 2010. For the quarter, the Company reported net income of $172 million, or $2.00 diluted EPS and revenue of $568 million, as compared to net income of $165 million, or $1.99 diluted EPS and revenue of $418 million, for the same period a year ago.

51. On April 29, 2010, the Company filed a quarterly report for the period ended March 27, 2010 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

52. On July 29, 2010, the Company issued a press release announcing its financial results for the second quarter ended June 26, 2010. For the quarter, the Company reported net income of $159 million or $1.84 diluted EPS and revenue of $588 million, as compared to net income of $181 million, or $2.11 diluted EPS and revenue of $526 million, for the same period a year ago.

53.     Later in the day, the Company held a conference call with analysts. Defendant Gillette represented, in relevant part, the following:

> Finally in Q2, reflected costs associated with the modular replacement program. During the period from June of 2008 to June of 2009, a manufacturing excursion affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in affected modules. The root cause was identified and subsequently mitigated in June of 2009. Ongoing testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well under way, and in some cases complete. Some of these efforts go beyond our normal warranted coverage. We accrued the estimated full cost of these additional efforts in our Q2 results….

54.     During the conference call, the Company's CFO represented, in relevant part, the following:

> During the second quarter, we accrued $17.8 million in cost of sales for expected module replacement costs and our cost of goods sold. In addition, we accrued $5.6 million of operating expenses associated with this process excursion, bringing our total accrued expenses to $27.4 million at the end of the second quarter.

55.     On August 2, 2010, the Company filed a quarterly report for the period ended June 26, 2010 on Form 10-Q with the SEC, and reiterated the Company's quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.     The 10-Q represented the following, in relevant part:

> During the period from June 2008 to June 2009, a manufacturing excursion
> occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in

- 16 -

the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we have accrued additional expenses of $17.8 million in the second quarter of 2010 and $29.5 million in total to date to cover the replacement of the anticipated affected module population in the field.

57.    On October 28, 2010, the Company issued a press release announcing its financial results for the third quarter ended September 25, 2010. For the quarter, the Company reported net income of $177 million, or $2.04 diluted EPS and revenue of $798 million, as compared to net income of $153 million, or $1.79 diluted EPS and revenue of $481 million, for the same period a year ago.

58.    On November 1, 2010, the Company filed a quarterly report for the period ended September 25, 2010 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59.    The 10-Q represented the following, in relevant part:

The $18.3 million increase in other costs for the nine months ended September 25, 2010 was due to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in

some cases, complete.  Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $22.4 million in the first half of 2010 and $29.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. We did not incur any incremental costs during the third quarter of 2010.

60.    On December 14, 2010, the Company issued a press release announcing financial guidance for 2011. The Company stated, in relevant part, the following:

First Solar Inc. today announced 2011 financial guidance. In 2011, First Solar forecasts net sales in the range of $3.7 to $3.9 billion, up about 46% year over year compared to the midpoint of 2010 guidance provided on October 28, 2010. The net sales forecast is comprised of $2.8 to $2.9 billion of module sales and $0.9 to $1.0 billion of EPC/project development sales. EPS is forecasted to grow to between $8.75 to $9.50 per fully diluted share and consolidated operating income is $875 to $975 million. These forecasts include $80 - $85 million of manufacturing start-up expenses and $15-20 million of factory ramp costs associated with plant expansions. The Company plans to invest $1.0 to $1.1 billion of capital to nearly double production capacity by year-end 2012, to maintain existing capacity and to add infrastructure to support growth. First Solar expects to generate $1.0 - $1.1 billion of operating cash flow during 2011.

"First Solar revenue and profit is continuing to grow in 2011," said Rob Gillette, First Solar Chief Executive Officer. "We are benefiting from diversifying global partner demand and an increase in revenue from utility scale projects."

61.    On February 24, 2011, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2010. For the year, the Company reported net income of $664 million, or $7.68 diluted EPS and revenue of $2.6 billion, as compared to net income of $640 million, or $7.53 diluted EPS and revenue of $2 billion, for the same period a year ago. For the fourth quarter, the Company reported net income of $156 million, or $1.80 diluted EPS and revenue of $609.8 million, as compared to net income of $142 million, or $1.65 diluted EPS and revenue of $641 million, for the same period a year ago.

62.     On February 28, 2011, the Company filed an annual report for the period ended December 31, 2010 on Form 10-K with the SEC, which was signed by, among others, Defendants Ahearn and Gillette, and reiterated the Company's previously announced financial results and financial position. In addition, the Form 10-K contained a signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

63.     The 10-K also represented the following, in relevant part:

The net increase in other costs for 2010 includes $23.7 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $30.8 million in 2010 and $37.9 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $8.5 million in expenses accrued during the fourth fiscal quarter of 2010, reflecting updated best estimates of the total replacement costs, based on our field data and execution to date of the module replacement program.

64.     On May 3, 2011, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2011. For the quarter, the Company reported net income of $116 million, or $1.33 diluted EPS and revenue of $567 million, as compared to net income of $172 million, or $2.00 diluted EPS and revenue of $568 million, for the same period a year ago.

65.    On May 5, 2011, the Company filed a quarterly report for the period ended March 31, 2011 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

66.    The 10-Q represented the following, in relevant part:

Cost of sales for the three months ended March 27, 2010 included $4.5 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. Ongoing testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. No additional expense was accrued in the first quarter of 2011. $37.9 million in total-to-date has been accrued to cover the replacement of the anticipated affected module population in the field.

67.    On August 4, 2011, the Company issued a press release announcing its financial results for the second quarter ended June 30, 2011. For the quarter, the Company reported net income of $61 million, or $0.70 diluted EPS and revenue of $533 million, as compared to net income of $159 million or $1.84 diluted EPS and revenue of $588 million, for the same period a year ago.

68.    On August 5, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC, and reiterated the Company's

previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certification pursuant to SOX by Defendant Gillette, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

69.     The 10-Q represented the following, in relevant part:

Cost of sales for the three months ended June 26, 2010 included $17.8 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. Ongoing testing confirms that the corrective actions taken have been effective.   We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. We accrued $41.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $3.6 million in expenses accrued during the second quarter of 2011, reflecting updated best estimates of the total replacement costs, based on our field data and execution-to-date of the module replacement program.

70.     On October 26, 2011, the Company issued a press release announcing its financial results for the third quarter ended September 30, 2011. For the quarter, the Company reported net income of $196.5 million, or $2.25 diluted EPS and revenue of $1 billion, as compared to net income of $177 million, or $2.04 diluted EPS and revenue of $798 million, for the same period a year ago.

71.     On November 4, 2011, the Company filed a quarterly report for the period ended September 30, 2011 on Form 10-Q with the SEC, and reiterated the Company's previously announced quarterly financial results and financial position. In

addition, the Form 10-Q contained a signed certification pursuant to SOX by Defendant Ahearn, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

72.    The 10-Q represented the following, in relevant part:

> Cost of sales for the nine months ended September 25, 2010 included $22.4 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. Ongoing testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are in most cases complete or well underway for the remaining cases. These efforts go beyond our limited warranty obligation. We accrued $63.6 million in total-to-date manufacturing excursion expense to cover the replacement of the anticipated affected module population in the field. Such amounts include $25.6 million in expenses accrued during the nine months ended September 30, 2011, reflecting our most recent best estimates of the total replacement costs, based on our field data and execution-to-date of this excursion related module replacement program.

73.    The statements referenced in ¶¶34-72 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them: 1) the full impact of the manufacturing deviation on the Company's earnings; (2) the Company was improperly recognizing revenue concerning certain products in its systems business; (3) the Company lacked adequate internal and financial controls; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

**THE TRUTH BEGINS TO EMERGE**

74.    On February 28, 2012, after the market closed, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011. For the fourth quarter, the Company reported a net loss of $413 million, or  ($4.74) diluted EPS and revenue of $660 million, as compared to net income of $156 million, or $1.80 diluted EPS and revenue of $609.8 million, for the same period a year ago. For the year, the Company reported a net loss of $39.5 million, or ($0.46) diluted EPS and revenue of $2.8 billion, as compared to net income of $664 million, or $7.68 diluted EPS and revenue of $2.6 billion for the same period a year ago. The Company also disclosed, in relevant part, the following:

> Fourth quarter 2011 net sales were $660 million, a decrease of $345 million from the third quarter of 2011, primarily due to the timing of revenue recognition in our systems business and lower volume for module-only sales….

> The fourth quarter of 2011 was impacted by pre-tax charges of $393 million (reducing EPS by $3.90) associated with a non-cash goodwill impairment for our components business, $164 million (reducing EPS by $1.67) related to warranty and cost in excess of normal warranty expense, and $60 million (reducing EPS by $0.43) related to restructuring activities, as announced in December 2011.

75.    Immediately, the media noted the staggering charge taken by the Company associated with replacing defective panels. *Bloomberg News* noted that in the fourth quarter, the warranty problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date. It also put aside $37.8 million to cover future claims." The *Wall Street Journal* reported that the Company "has spent nearly $254 million replacing customers' solar panels that didn't

- 23 -

perform as promised and changing its warranty." Mark Bachman, an analyst at Avian Securities LLC noted that the "charges [are] about 10 times what they said they were going to be when they first reported the issue."

76.     On February 29, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by, among others, Defendant Ahearn, and reiterated the Company's previously announced financial results and financial position. In addition, the Form 10-K contained a signed certification pursuant to SOX by Defendant Ahearn, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

77.     The 10-K also represented the following, in relevant part:

2008-2009 Manufacturing Excursion

During the period from June 2008 to June 2009, a manufacturing excursion occurred whereby certain modules manufactured during that time period may experience premature power loss once installed in the field. The root cause of the manufacturing excursion was identified and addressed in June 2009. Beginning in 2009, we initiated a voluntary remediation program beyond our standard limited warranty pursuant to which we made commitments to customers with systems containing modules manufactured during the relevant period that we would cover certain costs of remediation efforts. These remediation efforts included module removal, replacement and logistical services and additional compensation payments to customers under certain circumstances. Our best estimate for costs of our voluntary remediation program, as of and in each fiscal period in question, has been based on evaluation and consideration of the then-currently available information, including the estimated number of affected modules in the field, historical experience related to our voluntary remediation efforts, customer-provided data related to potentially affected systems and the estimated costs of performing the logistical services covered under our remediation program.

* * *

In the fourth quarter of 2011, we accrued additional expenses in excess of standard product warranty liability relating to our voluntary remediation program. A principal driver behind such additional accrual was our greater understanding as of year-end, obtained through the processing of thousands of claims as described below, of the number of modules not affected in the manufacturing excursion that needed to be removed (and subsequently replaced) in order for us to be able to identify and remedy the number of modules actually affected by the manufacturing excursion….

In response to our communications to customers regarding our intent to undertake a voluntary remediation program, we received more than five thousand customer claims, which covered an installed base greater than our entire production output during the June 2008 - June 2009 timeframe. In our processing of these claims to date, we have determined that we will take remediation actions in accordance with our voluntary remediation program with respect to approximately 1,100 of such claims, approximately an additional 200 claims could, pending receipt of additional information, qualify for remediation, and the balance of approximately 4,000 claims have been or will be rejected as they did not meet the criteria for participation in our voluntary remediation program (including claims containing insufficient data necessary to evaluate them). We have expensed $215.7 million total to-date for the estimated costs of remediating systems affected by modules manufactured during the relevant period, including $145.6 million for remediation expenses beyond our limited warranty obligations and $70.1 million in product warranty expense reflecting the net increase in the expected number of replacement modules required in connection with our remediation efforts….

78.     On this news, First Solar securities plummeted $4.10 per share or 11%, to close at $32.30 per share on February 29, 2012.

79.     On March 2, 2012, in an article published by *Seeking Alpha*, Defendant Ahearn admitted that the extent of the Company's manufacturing problem was greater than previously disclosed, by acknowledging that an "estimated **four percent to eight percent** of the cadmium telluride (CdTe) thin-film modules manufactured by First Solar between June 2008, and June 2009, had a 'process control' issue, which resulted in a potential 'premature power loss once in the field,'" and that the problem affected

the Company's global production involving all three of First Solar's CdTe manufacturing facilities at the time (in Ohio, Germany, and Malaysia) (emphasis added).

80.     As of March 21, 2012, First Solar has been named defendant in at least one  class action lawsuit alleging violations of federal securities laws as a result of Defendants' improper handling of the manufacturing problem and the ensuing financial debacle for the Company.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

81.     Plaintiff brings this action derivatively in the right, and for the benefit, of the Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

82.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

83.     Plaintiff is the owner of First Solar common stock and was the owner of First Solar common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

84.     At the time that this action was commenced, the Company's Board consisted of the following directors: Defendants Ahearn, Gillette, Kennedy, Post, Presby, Sweeney, Villarreal and Stebbins.

85.     As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

### A.     Demand Is Excused Because the Board's Conduct Is Not a Valid Exercise of Business Judgment

86.     As the ultimate decision-making body of the Company, the Board affirmatively adopted and condoned deliberate and widespread violations of applicable law.  Breaking the law is not a legally protected business decision, and such conduct is not considered a valid exercise of business judgment.  Defendants also knowingly, in reckless disregard of their fiduciary duties, or at a minimum with gross negligence, participated in the misrepresenting the Company's operations and financial prospects.  Accordingly, demand on the Board is excused.

87.     A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which Defendants face potential personal liability.  Violations of the law, approving violations of applicable law by others, or looking the other way while refusing to prevent others under the Board's control from violating the law are forms of misconduct and not legitimate business conduct.  The protections of the "business judgment rule" do not extend to such malfeasance.  Nor can such malfeasance ever constitute the "good faith" required of corporate fiduciaries.

88.     Moreover, each member of the Board directly made and/or caused the Company to disseminate improper, materially false and misleading public statements concerning, among other things, the Company's purported financial prospects and the adequacy of the Company's internal controls.  For the reasons stated herein, the Board knew or should have known the scale of the manufacturing problem and the costliness of the subsequent remediation measures.  In addition, when deciding whether to sign or approve statements to be publicly disseminated, the Board was also bound by their duty of care to inform themselves of all reasonably available material information.  The fact that First Solar could no longer meet its revenue projections as result of its manufacturing problem, and that its remediation measures will dramatically affect the profitability of its solar module business were reasonably available and material.

89.     The Board's tacit or express approval of the Company's misrepresentations and omissions concerning the manufacturing problem and subsequent remediation measures, and their participation in the dissemination of improper public statements, cannot be regarded as a valid exercise of business judgment.

**B.     Demand Is Excused Because a Majority of the Board
Faces a Substantial Likelihood of Liability**

90.     Even if knowingly presiding over multiple violations of applicable law could somehow fall within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the Board is not disinterested because they face a substantial likelihood of liability for their conduct.

91.     Every member of the Board was aware of, or should have been aware that the manufacturing problem would have a major impact on its future revenue and

the subsequent remediation measures would incur substantial costs to the Company. Despite clearly being placed on notice of these issue, every member of the Board consciously disregarded their fiduciary duties to First Solar when, under their direction, the Company continued to misrepresent the status and financial prospects of the Company. Accordingly, the entire Board faces a substantial likelihood of liability for ignoring these problems. Thus, demand is excused.

92.     During the Relevant Period, defendants Presby, Kennedy and Stebbins served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports and reviewing the adequacy of the Company's internal controls. Additionally, the members of the Audit Committee are required to oversee the Company's financial statements, earning releases and financial information and guidance proved to analysts and rating agencies, including the types of information to be disclosed and any significant financial reporting issues that have arisen in connection with the preparation of the Company's financial statements. Defendants Presby, Kennedy and Stebbins were aware of the Company's dissemination of materially false and misleading statements and, yet, still permitted the Company to portray to the public the Company's false and misleading information despite their heightened fiduciary obligations as members of the Company's Audit Committee. Therefore, defendants Presby, Kennedy and Stebbins each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

93.     During the Relevant Period, defendants Sweeney, Stebbins, Villarreal and Post have served as members of the Compensation Committee.  Pursuant to the Compensation Committee's charter, directors on the Compensation Committee are responsible for, *inter alia*, reviewing and approving compensation for the Company's chief executive officer and determining the compensation of all executive officers. The Compensation Committee Defendants breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, awarded the above-discussed compensation to the Company's executive officers despite their misrepresentation and omissions concerning the manufacturing problem and subsequent remediation measures, which artificially inflated the Company's so-called revenues and, in turn, artificially inflated the compensation awarded during the Relevant Period.  Further, the Compensation Committee has done nothing to rectify its above failures even after defendants' scheme came to light.    Therefore, the Compensation Committee defendants (if not the entire Board) each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

94.     The Company's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards.  These defendants are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options.  The following chart illustrates the substantial compensation that non-employee directors Kennedy, Nolan, Post, Presby, Stebbins, Sweeney and Villarreal received, which demonstrates that demand upon such individuals would be futile:

95.     The Company's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards.  These defendants are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options.  The following chart illustrates the substantial compensation that non-employee directors Kennedy, Nolan, Post, Presby, Stebbins, Sweeney and Villarreal received, which demonstrates that demand upon such individuals would be futile:

| 2010 DIRECTOR COMPENSATION | | | |
|---|---|---|---|
| DIRECTOR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | TOTAL |
| Kennedy | $75,000 | $100,214 | $175,214 |
| Nolan | $75,000 | $100,214 | $175,214 |
| Post | $47,953 | $57,039 | $104,992 |
| Presby | $110,000 | $100,214 | $210,214 |
| Stebbins | $75,000 | $100,214 | $175,214 |
| Sweeney | $85,000 | $100,214 | $185,214 |
| Villarreal | $85,000 | $100,214 | $185,214 |

96.     Finally, every member of the Board is required to comply with the Code of Conduct.  The Company's Code of Business Conduct and Ethics states in part:

This Code of Business Conduct and Ethics of First Solar, Inc. and its subsidiaries summarizes the values, principles and business practices that guide our business conduct.  This Code sets out a set of basic principles to guide employees regarding the minimum requirements expected of them; however, this Code does not provide a detailed description of all employee policies.  **For purposes of this Code, references to "employees" include employees, officers and directors of the Company.**

\* \* \*

1.    Compliance with Laws Rules and Regulations

We have a long-standing commitment to conducting our business in compliance with applicable laws and regulations in accordance with the

highest ethical principles.  This commitment helps ensure our reputation for honesty, quality and integrity.

(Emphasis in original.)

97.     Each member of the Board permitted individuals at all levels of the Company to engage in the misconduct described above, thereby abdicating their fiduciary duties to the Company, and severely damaging the Company.  Therefore, every member of the Board faces a substantial likelihood of liability for their breaches of fiduciary duties, and any demand upon them is futile.

98.     The entire Board and senior management participated in the wrongs complained of herein.  For the reasons described herein, the Company's directors are not disinterested or independent.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.  Each of the above-referenced defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.  Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws.

**C.     Other Reasons Demand is Excused**

99.     The principal professional occupation of defendant Ahearn is his employment with First Solar as President and Chief Executive Officer, pursuant to which he has received and continues to receive substantial monetary compensation and

- 32 -

other benefits.  In addition, Defendant Ahearn certified certain of the Company's SEC filings.  Accordingly, demand is futile as Ahearn faces a substantial likelihood of liability for breach of fiduciary duties owed to the Company.  Thus, as the Company's CEO, defendant Ahearn is not an independent director capable of impartially considering a demand to commence and vigorously prosecute this action, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

100.    In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

101.    Defendants Ahearn, Nolan, Sweeny, and Presby sold Company stock while in possession of adverse Company information, thereby excusing demand.

102.    Defendants Kennedy, Presby, Stebbins, and Post, as members of the Project Development Risk Committee, owed and owe specific additional duties to First Solar under the Company's Project Development Risk Committee Charter. The Charter requires the Project Development Risk Committee Defendants to, among other things: (i) review and monitor the Company's portfolio performance against established goals and objectives; (ii) review the status of major projects; and (iii) track leading indicators and assess their impact on future development activities and existing projects assets. As a result of these responsibilities, the Project Development Risk Committee Defendants were intimately aware of, among other material facts, the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the Company's solar panels. Despite their knowledge, or with reckless disregard, the

Project Development Risk Committee Defendants caused, and additionally in some instances signed, improper statements relating to, among other things, the true nature and extent of remediation efforts needed by the Company to respond to the manufacturing deficiencies plaguing the Company's solar panels. Accordingly, the Project Development Risk Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Project Development Risk Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties. Any demand upon them is futile.

103.    The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification.

104.    Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it.

105.    Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

106.   The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby.

107.   Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

108.   Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons: (1) First Solar is a publicly held company, with more than 86 million shares outstanding and thousands of shareholders; (2) making demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and (3) making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

109.   Furthermore, the conduct alleged herein could not have been the product of good- faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages.

**COUNT I**
**(AGAINST THE INDIVIDUAL DEFENDANTS**
**FOR BREACH OF FIDUCIARY DUTY)**

110.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

111.   The Individual Defendants owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws.  The Individual Defendants, however, breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls and by allowing the Company to issue and disseminate misleading statements and filings.

112.   The Individual Defendants have engaged in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that the Company complied with applicable laws, rules and regulations.

113.   As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.  Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.  The alleged acts of wrongdoing have subjected the Company to unreasonable risks of loss and expenses.

114.   Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing public and abdicating his or her oversight responsibilities to the Company have

subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.

### COUNT II
### (AGAINST THE INDIVIDUAL DEFENDANTS
### FOR GROSS MISMANGEMENT)

115.    Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

116.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage, and control the operations, business, and internal financial accounting and disclosures of the Company.   The Individual Defendants, however, by their actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor in the management and administration of the Company's affairs and in the use and preservation of the Company's assets.

117.    During the course of the discharge of their duties, the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, the Individual Defendants caused the Company to engage in the scheme described herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.   As a result, the

Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

## COUNT III
## (AGAINST THE INDIVIDUAL DEFENDANTS
## FOR CONTRIBUTION AND INDEMIFICATION)

118.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

119.   The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

120.   The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants.  The Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

## COUNT IV
## (AGAINST THE INDIVIDUAL DEFENDANTS
## FOR ABUSE OF CONTROL)

121.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

122.   The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

123.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT V
### (AGAINST THE INDIVIDUAL DEFENDANTS
### FOR WASTE OF CORPORATE ASSETS)

124.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

125.   The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

126.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

C.    Granting such other and further relief as the Court deems just and proper.

1

2

## JURY DEMAND

3      Plaintiff hereby demands a trial by jury.

4   DATED: May 16, 2012

5                                          BURCH & CRACCHIOLO, P.A.

6                                          By:   s/Edwin D. Fleming
                                                 Edwin D. Fleming
7                                                Jake D. Curtis
                                           702 E. Osborn Road – Suite 200
8                                          Phoenix, Arizona 85011

9                                          *Local Counsel for Plaintiff*

10

11

12

13                                         GLANCY BINKOW & GOLDBERG LLP
                                           LIONEL Z. GLANCY
                                           MICHAEL M. GOLDBERG
14                                         EX KANO S. SAMS II
                                           1925 Century Park East, Suite 2100
15                                         Los Angeles, California 90067
                                           Telephone:    (310) 201-9150
16                                         Facsimile:    (310) 201-9160

17

18                                         LAW OFFICES OF HOWARD G. SMITH
                                           Howard G. Smith
19                                         3070 Bristol Pike, Suite 112
                                           Bensalem, PA 19020
20                                         Telephone:    (215) 638-4847
                                           Facsimile:    (215) 638-4867
21

22                                         *Attorneys for Plaintiff*

23

24

25

26